IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| KEISHA TURNER and ROY CHRISTOPHER TURNER, individually and as next friends of RBT and CT, | ) ) ) | |
| | ) | NO. 3:18-cv-00721 |
| Plaintiffs, | ) | |
| | ) | JUDGE RICHARDSON |
| v. | ) | |
| | ) | |
| DEBORAH LOWEN, M.D., VANDERBILT UNIVERSITY MEDICAL CENTER, CHRISTY DUNCAN, and TONYA SCOTT, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Pending before the Court is Defendants Deborah Lowen, M.D. and Vanderbilt University Medical Center's Motion to Dismiss (Doc. No. 58), supported by an accompanying brief (Doc. No. 59). Also pending before the Court is Defendants Tonya Scott and Christy Duncan's Motion to Dismiss (Doc. No. 53), supported by an accompanying brief (Doc. No. 54). Plaintiffs Keisha Turner and Roy Christopher Turner, individually and as next friends of RBT and CT (collectively "Plaintiffs") filed responses to the motions to dismiss (Doc. Nos. 65, 66), and Defendants have in turn replied (Doc. Nos. 68, 71). For the below-stated reasons, the motions will be **GRANTED.**

## ALLEGED FACTS[1]

In 2014, Plaintiffs Keisha and Roy Christopher Turner's son, RBT, was born. (Doc. No. 52 at ¶ 6). On December 11, 2014, Ms. Turner noticed swelling in RBT's left leg and transported him to Cumberland Hospital's Emergency Department for evaluation. (*Id.* at ¶ 8). At Cumberland,

---

[1] The cited facts are alleged in the Complaint and accepted as true for purposes of the instant motion to dismiss.

medical staff examined RBT and obtained x-rays of his legs and torso. (*Id*.). Cumberland discharged RBT and instructed Ms. Turner to follow up with RBT's pediatrician the following day. (*Id*.). On December 12, 2014, Ms. Turner took RBT to his pediatrician's office and Nurse Practitioner Kristin Hassler examined him. (*Id*.). Ms. Hassler informed Ms. Turner that RBT had multiple rib fractures. (*Id*.). Ms. Hassler instructed Ms. Turner to go to the sheriff's office and provided Ms. Turner a note to give to the Tennessee Department of Children's Services ("DCS") which requested that RBT be taken to East Tennessee Children's Hospital. (*Id*.).

That same day, Mr. and Ms. Turner went to the Cumberland Sheriff's Office where Investigator Chad Norris, Investigator David Moore, and DCS worker Ivan Hawn interviewed them regarding RBT's injuries. (*Id*. at ¶¶ 8-9). During the interview, Mr. Hawn instructed Mr. and Ms. Turner to take RBT to Defendant Vanderbilt University Medical Center ("VUMC"), which was a 2.5 hour drive away, despite Ms. Turner's request that RBT return to East Tennessee Children's Hospital. (*Id*. at ¶ 10). That evening, Mr. and Ms. Turner traveled to Nashville, Tennessee, and VUMC admitted RBT. (*Id*. at ¶ 11).

On December 13, 2014, Defendant Deborah Lowen, M.D. ("Dr. Lowen") met with Mr. and Ms. Turner separately to discuss the cause of RBT's injuries. (*Id*. at ¶ 12). Dr. Lowen did not inform Mr. and Ms. Turner that they did not have to speak to her, that they should seek counsel, or that the potential outcome of this event would be the emergency removal of RBT from his parents' care and control. (*Id*.). Dr. Lowen charted in her consultation note that she met with both parents separately at the hospital to discern the potential cause of RBT's injuries "in order to obtain a detailed history on the course of events[.]" (*Id*. at ¶ 14). She also charted that her "team" was contacted directly by DCS worker Hawn due to an identification of a left leg fracture and multiple rib fractures. (*Id*. at ¶ 13).

Dr. Lowen also remarked in her consultation note that she had reviewed East Tennessee Children's Hospital's discharge summary that indicated RBT had a vitamin D deficiency, but that that deficiency did not explain RBT's multiple fractures of multiple different sites. (*Id*. at ¶ 15). She further opined in her consultation note that "it is apparent that [RBT] has been a victim of child physical abuse (non-accidental trauma) occurring on more than 1 occasion and affecting multiple different bones. . . . He needs to be protected from further harm." (*Id*. at ¶ 16). Dr. Lowen informed DCS worker Hawn that RBT had multiple rib fractures, fractures in both legs, and a fracture in his shoulder blade that could not be explained by RBT's medical and family history. (*Id*. at ¶ 18). She also informed Hawn that Mr. and Mrs. Turner did not provide a history of trauma to explain any of the fractures and that the injuries were caused by repeated episodes of trauma. (*Id*.).

Hawn determined that the legal threshold for abuse was satisfied by Dr. Lowen's medical diagnosis. (*Id*.). Shortly thereafter, a court found probable cause of abuse and entered an *ex parte* protective custody order granting DCS custody of RBT. (*Id*. at ¶ 19). The court faxed its order to VUMC, which prevented the Turners from leaving VUMC with RBT. (*Id*.). DCS placed RBT in the care of his paternal grandfather, Roy Turner. (*Id*. at ¶ 21). DCS granted Mr. and Ms. Turner limited visitation of RBT. (*Id*.). Defendant Christy Duncan, a DCS employee, became the case manager in control of the care and placement of RBT. (*Id*. at ¶ 22). On January 21, 2015, the Turners asked Duncan whether DCS would test RBT for brittle bones and Duncan informed them that DCS would not perform further testing. (*Id*. at ¶ 23). On February 25, 2015, Duncan administratively substantiated that RBT was physically abused and that Ms. Turner was the perpetrator. (*Id*. at ¶ 24).

The Turners fought the juvenile court's custody determination and as part of that litigation, Dr. Lowen stated in her deposition that she had "no doubt" that RBT had suffered from child abuse, which resulted in the multiple fractures that he presented with at VUMC in December 2014. (*Id*. at ¶ 19). She also testified that VUMC's "child abuse team" was not funded by the state in any way but admitted that she had a contract with the state to review near fatalities, and label them as near fatalities or not for the state's child death review process. (*Id*. at ¶ 28).

Ms. Turner gave birth to another son, Plaintiff CT, on September 4, 2015. (*Id*. at ¶ 29). On September 8, 2015, DCS investigator Tonya Scott filed a petition asking for a determination of abuse and neglect of CT based on Dr. Lowen's deposition testimony in May 2015 concerning injuries of CT's brother, RBT. (*Id*.). DCS obtained custody of CT and placed him in the care of his paternal grandfather, Roy Turner. (*Id*.). Mr. and Ms. Turner continued to fight the determination of DCS for over two years and on August 4, 2017, a court returned full custody of RBT and CT to the Turners. (*Id*. at ¶¶ 39-40). At the final hearing, the judge explained that there are very serious medical conditions that can mimic child abuse and exonerated the Turners of all allegations of abuse. (*Id*. at ¶ 40).

On August 3, 2018, Mr. and Ms. Turner, individually and on behalf of RBT and CT, brought this action against VUMC, Dr. Lowen, and DCS employees Scott and Duncan (collectively "Defendants"). (Doc. No. 1). Plaintiffs filed a First Amended Complaint on December 6, 2018. (Doc. No. 52). Dr. Lowen and VUMC, as well as Scott and Duncan, have filed motions to dismiss. (Doc. Nos. 53, 58). Plaintiffs have responded, (Doc. Nos. 65, 66), and Defendants have replied (Doc. Nos. 68, 71). Therefore, this matter is ripe for adjudication.

## LEGAL STANDARD

For purposes of a motion to dismiss, the Court must take all of the factual allegations in the complaint as true as the Court has done above. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*. at 678; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010); *Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. Identifying and setting aside such allegations is crucial, because they simply do not count toward the plaintiff's goal of showing plausibility of entitlement to relief. As suggested above, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id*. at 681. The

question is whether the remaining allegations – factual allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id.* If not, the pleading fails to meet the standard of Fed. R. Civ. P. 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id.* at 683.

## ANALYSIS

### I. Plaintiffs' Cause of Action

Under a single heading labeled "Cause of Action", Plaintiffs contend that they have alleged "sufficient facts to show that the[ir] Fourth and Fourteenth Amendment rights were violated by the Defendants and they are entitled to damages under 42 U.S.C. § 1983." (Doc. No. 52 at ¶ 56). Specifically, Plaintiffs allege that

> [t]he minor children, RBT and CT were wrongfully seized and removed from their parents in violation of their Fourth and Fourteenth Amendment rights due to the negligent investigation and withholding of exculpatory evidence by Dr. Lowen and Tonya Scott which would negate probable cause of child abuse. Christy Duncan willfully violated the rights of the children by foreclosing other medical examinations of the children and by withholding from the [juvenile court] exculpatory medical information which would negate probable cause, thus causing the children to be removed for over two years.

(*Id.* at ¶ 57). With respect to Mr. and Ms. Turner's claims, Plaintiffs allege that

> [t]he parents were wrongfully arrested (loss of their liberty interest to parent their children) and maliciously prosecuted due to the negligent investigation of Dr. Lowen and Tonya Scott in the concealment of medical information which would negate probable cause of child abuse. Christy Duncan willfully violated the rights of the parents by foreclosing other medical examination of the children and by failing to inform the [juvenile court] of medical information which would negate probable cause, thus causing the parents to suffer under wrongful prosecution for two years.

(*Id.* at ¶ 58). Plaintiffs describe the actions of each Defendant as follows:

> 60. As to Dr. Deborah Lowen: The plaintiffs would show that Dr. Lowen placed herself in an investigatory role and conducted a negligent investigation directly causing the wrongful seizure of the children (Fourth Amendment) and the loss of the constitutional right of family integrity (Fourteenth Amendment) for the parents, RBT, and CT; and the malicious prosecution of the parents. Dr. Lowen postured herself to present her "medical diagnosis" as a legal conclusion in proffering it to

DCS as reason for removal of RBT and CT from the care and control of their parents. Lowen intentionally withheld information related to possible medical conditions that could mimic child abuse by manifesting with the same or similar injuries to the child. Either Lowen acted independently and concealed this information from DCS, or Lowen acted in concert with DCS employees to conceal this exculpatory information from the [juvenile court] in the petition prior to the [juvenile court] making a probable cause determination which lead to the removal of RBT and CT. Lowen is a state actor.

61. As to Vanderbilt University Medical Center: Vanderbilt has placed itself in such a symbiotic role with DCS that they have become an extension of DCS for the purposes of investigation of child abuse using Dr. Deborah Lowen. The financial relationship between DCS and Vanderbilt shows that Vanderbilt stands to profit from its relationship with DCS in its multiple roles and engaging in conduct which mimics a "child abuse investigation" eases the burden of DCS. Vanderbilt is a state actor and is liable for the actions of Lowen. The practices and policies of Vanderbilt are the moving force behind the role taken by Lowen to act as investigator and impugn parents for child abuse without disclosing other mimics of child abuse before the [juvenile court] makes a probable cause determination to remove the child.

62. As to DCS investigator Tonya Scott: Scott relied solely on the medical opinion of Lowen regarding RBT to remove CT from the care and control of his parents without providing the [juvenile court] with the exculpatory evidence that RBT's bone abnormalities could have been cause by metabolic bone disorder. Scott withheld from the [juvenile court] information that medical opinions differ on the etiology of this type of fractures.

63. As to DCS worker Christy Duncan: Duncan relied solely on the medical opinion of Lowen regarding RBT to substantiate abuse against the Mother and to retain the child in the care and custody of DCS (removed from their parents) even after she had received credible information that RBT's bone abnormalities could have been caused by metabolic bone disease and not abuse. Duncan received credible information through the course of the case and failed to include those findings in her investigation or inform the [juvenile court] that DCS had limited its opinion to the one medical provider with whom DCS had a financial partnership.

(*Id.* at ¶¶ 60-63). Plaintiffs aver that "[d]ue to the [above-described] actions of Lowen, Duncan, and Scott individually and collectively the [sic] acted to violate the constitutional rights of the plaintiffs." (*Id.* at ¶ 64).

**II. Duncan and Scott are Absolutely Immune from Suit**

Duncan and Scott assert that they are shielded from Plaintiffs' claims by absolute immunity because Duncan and Scott's alleged actions were taken in their prosecutorial capacity. Case workers and social workers are entitled to absolute immunity from § 1983 claims, "'akin to the scope of absolute prosecutorial immunity,' for conduct 'intimately associated with the judicial phase of the criminal process.'" *Brent v. Wayne Cnty. Dep't of Human Servs.*, 901 F.3d 656, 683-84 (6th Cir. 2018) (quoting *Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 724 (6th Cir. 2011)). In other words, "social workers are absolutely immune only when they are acting in their capacity as legal advocates—initiating court actions or testifying under oath—not when they are performing administrative, investigative, or other functions." *Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000) (en banc). "The doctrine of absolute immunity applies even if social workers make knowingly false statements in the petition for a removal order and while advocating before the court." *Brent*, 901 F.3d at 684 (citing *Pittman*, 640 F.3d at 725–26). The party seeking absolute immunity has the burden of demonstrating that the immunity is justified for the function being challenged. *Bauch v. Richland Cnty. Children Servs.*, 773 F. App'x 292, 295 (6th Cir. 2018).

The Sixth Circuit has held on multiple occasions "that the submission of an affidavit that triggers judicial child-removal proceedings is in fact an act of legal advocacy by social workers." *Bauch*, 773 F. App'x at 296 (citing *Barber v. Miller*, 809 F.3d 840, 843 (6th Cir. 2015)). In *Barber*, a father alleged that a social worker included falsehoods and misrepresentations in a petition for protective custody in order to obtain an *ex parte* order for immediate removal of his child. 809 F.3d at 843. The Sixth Circuit held that the social worker was entitled to absolute immunity against those allegations because the social worker "offered his factual assessment in his capacity as a

legal advocate initiating a child-custody proceeding in family court." *Id.* at 843–44. The court explained that that "[a] social worker acts as a legal advocate when initiating court proceedings, filing child-abuse complaints, and testifying under oath," and that "this absolute immunity holds, even under allegations that the social worker intentionally misrepresented facts to the family court." *Id.* at 844; *see also Schattilly v. Daugharty,* 656 F. App'x 123, 135 (6th Cir. 2016) ("[Absolute] immunity includes social workers' statements in complaints or affidavits that they submit to courts—even if the statements are false or misleading." (citing *Pittman*, 640 F.3d at 724–25)).

All of the allegations present in the First Amended Complaint pertaining to Scott's conduct involve representations (or rather, the alleged lack of representations of "exculpatory" medical information) made to the juvenile court in initiating the *ex parte* removal of CT. (*See* Doc. No. 52 at ¶¶ 29, 62). Like the social worker in *Barber*, Scott acted as a legal advocate when initiating the removal proceedings of CT. Thus, absolute immunity protects Scott's actions taken in her effort to initiate child-removal proceedings of CT.

Plaintiffs argue that Scott is not entitled to enjoy absolute immunity because "Scott withheld exculpatory evidence as the complaining witness when she sought to remove [] CT from his parents[.]" (Doc. No. 65 at 17). Plaintiffs cite *Young v. Vega*, 574 F. App'x 684 (6th Cir. 2014) for the proposition that social works are not entitled to absolute immunity for their role as a complaining witness. (*Id.*). Although *Young* does stand for this proposition, the Sixth Circuit recently explained that *Young* is no longer good law.

> True, we once held that a social worker could not receive absolute immunity for "the act of personally vouching for the truth of the facts that provide the evidentiary support for [the family court's] finding of probable cause." *Young v. Vega*, 574 F. App'x 684, 689 (6th Cir. 2014). *Young, however, is unpublished and non-binding, and our later published precedent overrides Young's holding. . . .* Because a petition for a removal order triggers a subsequent hearing in court, [] a

9

> social worker's actions as a complaining witness are "more analogous to a prosecutor's decision to prosecute than a police officer's testifying by affidavit in support of probable cause." *Bauch v. Richland Cty. Children Servs.*, 733 F. App'x 292, 297 (6th Cir. 2018). The district court therefore did not err in granting absolute immunity to [the defendant social worker] for serving as the "complaining witness" in support of the removal order.

*Brent*, 901 F.3d at 684-5 (emphasis added). Therefore, given this on-point, binding Sixth Circuit precedent, the Court finds Plaintiffs' argument unpersuasive. Plaintiffs allege that Scott filed with the juvenile court a petition that caused the court to enter an order finding probable cause for the removal of CT from the custody of his parents. (Doc. No. 52 at ¶ 62). Accordingly, Scott was acting as a legal advocate and is entitled to absolute immunity. Thus, the Fourth and Fourteenth Amendment claims against her will be dismissed.

Duncan likewise is entitled to absolute immunity for her alleged acts. Plaintiffs allege that Duncan administratively substantiated probable cause of abuse of RBT by Ms. Turner to the juvenile court and concealed pertinent medical information from the juvenile court. (*Id*. at ¶ 63). She was acting in the capacity of legal advocate when completing these acts, which are "intimately associated with the judicial phase" of the removal proceedings. *Pittman*, 640 F.3d at 724. Plaintiffs also allege that Duncan refused to have RBT tested for brittle bone disease during her investigation, thus contributing to the prolonged seizure of RBT, and that she otherwise inadequately investigated the cause of RBT's injuries. (Doc. No. 52 at ¶ 63). Plaintiffs argue that Duncan is not absolutely immune for these acts, because (according to Plaintiffs) they are *investigatory*. The Court agrees that actions taken in an investigative capacity usually are not entitled to absolute immunity. *See Holloway*, 220 F.3d at 775. However, on multiple occasions the Sixth Circuit has held that social workers are entitled to immunity on similar failure-to-investigate claims. As the court explained in *Pittman*:

Neither can Pittman circumvent [the social worker's] absolute immunity for filing the complaint and affidavits by stating a claim based on "her underlying action in failing to properly investigate [him], which led her to put false information" in those documents. While conduct pursuant to a social worker's investigatory functions are not entitled to absolute immunity, *see Achterhof v. Selvaggio*, 886 F.2d 826, 830 (6th Cir. 1989) (denying absolute immunity to a social worker's decision to initiate and continue an investigation of possible child abuse), this Court rejected a similar failure-to-investigate claim in *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416 (6th Cir. 2001). In that case, this Court extended absolute immunity to two social workers who "failed to conduct a careful investigation before incorporating . . . false accusations in [a child abuse] petition." *Id*. at 421. This Court also determined that defendant social workers were absolutely immune from plaintiffs' allegation that they could have facilitated the return home of plaintiffs' child "had [they] performed an adequate investigation at any time after [the child's removal from plaintiffs' home by the juvenile court]." *Id*. at 422. After noting that "Tennessee law entrusts the decision whether to return a neglected child to the home from which he was removed to the Juvenile Court," this Court held that a social worker's "function of making . . . recommendations" on such matters to the juvenile court, "*including the underlying investigation*, is . . . intimately related to the judicial phase of child custody proceedings" and therefore protected by absolute immunity. *Id*. at 422–23 (emphasis added). . . . Thus, [the social worker's] absolute immunity also protects her from Pittman's claim that her allegedly false assertions in the complaint and affidavits stem from an inadequate investigation. For these reasons, the district court erred by determining that [the social worker] was not absolutely immune from Pittman's claims based on the complaint and two affidavits she submitted to the juvenile court.

*Pittman*, 640 F.3d at 726; *see also Brent*, 901 F.3d at 684 ("We have previously rejected efforts to 'circumvent' a social worker's absolute immunity for filing a petition 'by stating a claim based on [the social worker's] underlying action in failing to properly investigate' the case.") (quoting *Pittman*, 640 F.3d at 726) (internal quotation marks omitted). That is precisely what Plaintiffs claim happened here: Duncan failed or refused to investigate other possible medical causes of RBT's injuries, thereby "concealing from the [juvenile court] that new information was available that would have undermined the probable cause determination." (Doc. No. 52 at ¶ 22). All of the allegations pertaining to Duncan's conduct involve either her representations (or lack thereof) to the juvenile court, or her inadequate investigation in preparing to make those representations. In light of the Sixth Circuit's holdings in *Pittman* and *Rippy*, the Court finds that Duncan is absolutely

immune from suit for these alleged actions. The Fourth and Fourteenth Amendment claims asserted against Duncan will be dismissed.

### III. Scott, Duncan, and Dr. Lowen are Entitled to Qualified Immunity[2]

Duncan, Scott, (alternatively) and Dr. Lowen contend that they are entitled to qualified immunity and therefore, this suit should be dismissed. "Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the defendant is entitled to a meritorious affirmative defense such as qualified immunity." *Peatross v. City of Memphis*, 818 F.3d 233, 240 (6th Cir. 2016). To survive the motion to dismiss on qualified-immunity grounds, the plaintiff must allege facts that "plausibly mak[e] out a claim that the defendant's conduct violated a constitutional right that was clearly established [by] law at the time, such that a reasonable [official] would have known that his conduct violated that right." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015). The plaintiff also must allege with particularity "facts that demonstrate what each defendant did to violate the asserted constitutional right." *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 564 (6th Cir. 2011) (internal citations, quotation marks, and emphasis omitted).

The plaintiff has the burden of demonstrating that the law was clearly established at the time of the challenged conduct. *See Hughes v. City of North Olmsted*, 93 F.3d 238, 241 (6th Cir. 1996). The inquiry into whether a right was clearly established must be conducted "in light of the specific context of the case." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . . [and] in the light of preexisting law the unlawfulness must be apparent." *Anderson*

---

[2] This is an alternative basis for dismissal of Scott and Duncan.

*v. Creighton*, 483 U.S. 635, 640 (1987); *see also Edwards v. Williams*, 170 F. Supp. 2d 727, 735 (E.D. Ky. 2001) (explaining that a plaintiff must show "that any officials in the defendants' positions, measured objectively, would have clearly understood that they were under an affirmative duty to refrain from the conduct."). In short, to ask, for qualified-immunity purposes, whether a constitutional right is clearly established is in effect to ask whether the defendant's alleged actions clearly violated a constitutional right.

The Sixth Circuit has instructed that "[w]hen determining whether a constitutional right is clearly established, [district courts should] look first to decisions of the Supreme Court, then to [Sixth Circuit] decisions and those of other courts within the circuit, and then to decisions of other Courts of Appeal." *Andrews v. Hickman Cnty., Tenn.*, 700 F.3d 845, 853 (6th Cir. 2012) (citing *Masters v. Crouch*, 872 F.2d 1248, 1251–52 (6th Cir. 1989)). While it is not necessary for there to be a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. *Mullenix v. Luna*, 36 S. Ct. 305, 308 (2015).

In analyzing the issue of qualified immunity, the "first step is to determine if the facts alleged make out a violation of a constitutional right. The second is to ask if the right at issue was 'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Although these two steps may be addressed in either order, both steps must be answered in the affirmative for the plaintiff's claim to proceed. *Id.* (citing *Pearson*, 555 U.S. at 236).

In the First Amended Complaint, RBT and CT (through Mr. and Ms. Turner as next of friend) assert a claim based on their alleged seizure in violation of the Fourth Amendment. Also, Mr. and Ms. Turner assert a claim based on multiple alleged violations of their own Fourth

Amendment rights. All Plaintiffs assert a claim based on the deprivation of their right to familial association in violation of the Fourteenth Amendment.[3]

*i. The Minors' Fourth Amendment Claim*

The First Amended Complaint asserts that "[t]he minor children, RBT and CT were wrongfully seized and removed from their parents in violation of their Fourth [] Amendment rights." (Doc. No. 52 at ¶ 57).

**Duncan and Scott**

Plaintiffs allege "Scott relied solely on the medical opinion of [Dr.] Lowen regarding RBT to remove CT from the care and control of his parents without providing the court with the exculpatory evidence that RBT's bone abnormalities could have been cause by metabolic bone disorder" and "Duncan relied solely on the medical opinion of [Dr.] Lowen regarding RBT to substantiate abuse against the Mother and to retain the child in the care and custody of DCS (removed from their parents) even after she had received credible information that RBT's bone abnormalities could have been caused by metabolic bone disease and not abuse."[4] (Doc. No. 52 at ¶¶ 62-63). Scott and Duncan argue that there was "no clearly established Fourth Amendment right against a social worker executing a removal order of a child at the time of the alleged events, *even if the social worker knew the removal order was based on inaccurate or incomplete information provided by the social worker to secure the order.*" (Doc. No. 54 at 7).

---

[3] A reader of the First Amended Complaint may wonder why Plaintiffs refer to the Fourteenth Amendment, and in particular, whether the Fourteenth Amendment is mentioned merely because it is the means through which the Fourth Amendment is made applicable to the states. Perhaps Plaintiffs had this in mind, but as noted below, the Court construes Plaintiffs' allegations as also asserting a Fourteenth Amendment due process claim.

[4] For purposes of the analysis, the Court will assume that allegations of Duncan *prolonging* a "wrongful seizure" implicate the Fourth Amendment to the same extent as allegations of Duncan causing a wrongful seizure in the first place.

The Sixth Circuit recently examined a similar situation. In *Brent*, decided in 2018, the plaintiffs argued that the defendant social worker violated their clearly established Fourth Amendment rights in 2010 by executing a removal order of the plaintiffs' minor children that the defendant knew was based on falsehoods. 901 F.3d at 685. Citing Sixth Circuit caselaw, the plaintiffs argued that it is "a well-established Fourth Amendment principle that an officer 'cannot rely on a judicial determination of probable cause' to justify executing a warrant 'if that officer knowingly makes false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant.'" *Id.* (quoting *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003)).[5]

The Sixth Circuit ultimately accepted the plaintiff's articulation of this Fourth Amendment principle but, crucially, held that such principle was not clearly established at the time in question in 2010:

> Though we entirely agree—and now directly hold—that a social worker, like a police officer, cannot execute a removal order that would not have been issued but for known falsities that the social worker provided to the court to secure the order, *this principle was not clearly established at the time [in 2010 when the defendant social worker] executed the order in this case.* Indeed, we held *as recently as [December] 2015* that "general assertions that 'the Fourth Amendment was violated as to [a child] when he was seized pursuant to [an] order' that he claims 'was based on false statements and otherwise lacked probable cause' invoke no clearly established right." *Barber*, 809 F.3d at 848. As *Barber* concerned conduct that occurred after the allegedly unlawful actions in this case, *see id.* at 842, we must grant [the defendant social worker] qualified immunity here.

*Id.* at 685 (emphasis added).

For these same reasons, the Court concludes that the alleged Fourth Amendment violation was not clearly established at the time of the alleged events. Plaintiffs allege that Duncan

---

[5] Plaintiffs also rely on this case in arguing that RBT and CT's Fourth Amendment rights were clearly established. (Doc. No. 65 at 10).

substantiated probable cause, therefore prolonging RBT's seizure, shortly after his removal in December 2014. Additionally, Plaintiffs allege that Scott petitioned for the removal of CT from Mr. and Ms. Turner's custody in September 2015. As noted in *Brent*, looking backwards from 2018, the Sixth Circuit held in December 2015 that a social worker's removal of a child based on a removal order that contained *falsehoods* was not a clearly established constitutional violation. *Brent*, 901 F.3d at 685; *Barber*, 809 F.3d at 842. Similarly, the Court finds it was not a clearly established constitutional violation to remove a child based on a removal order that contained *omissions* of facts (in this case, omitting evidence of other *possible* medical causes of RBT's injuries). Consequently, as *Barber* was decided in December 2015, and Duncan and Scott's alleged actions occurred prior to that, it would not have been sufficiently clear to Duncan and Scott that their actions violated a constitutional right "in the light of preexisting law[.]" *Anderson*, 483 U.S. at 640. Therefore, Duncan and Scott did not violate a clearly established right at the time that RBT and CT were allegedly seized in violation of their Fourth Amendment rights; thus, they are entitled to qualified immunity.

The Court finds Plaintiffs' arguments in opposition unpersuasive. First, Plaintiff attempts to distinguish *Barber*, but their argument focuses on why Duncan and Scott are not entitled to *absolute* immunity, rather than *qualified* immunity.[6] Thus, Plaintiffs' argument is inapposite. (Doc. No. 65 at 7-9). Second, to establish that the constitutional violation was clearly established,

---

[6] Plaintiffs assert that "Defendants misrepresent the holding in *Barber* . . . [because the court in *Barber*] held that the social worker had absolute immunity because she was acting 'in her capacity as a legal advocate' when she submitted affidavits to the Court misrepresenting facts." (Doc. No. 65 at 7 (citing *Barber*, 809 F.3d at 844)). Plaintiffs then proceed to argue, why they believe Duncan and Scott are not entitled to absolute immunity. (*Id*. at 7-9). Plaintiffs do all of this in the section of their response labeled "Duncan and Scott violated Plaintiffs' clearly established rights." Thus, Plaintiffs counter a *qualified*-immunity argument by responding that *absolute* immunity does not apply. The Court deciphers this argument as implying that the court in *Barber* discussed *only* absolute immunity, and that therefore *Barber* does not support Defendants' qualified-immunity argument. However, *Barber* also discussed whether a social worker was entitled to qualified immunity. *See Barber*, 809 F.3d at 844-45, and Defendants citation of *Barber*, 809 F.3d at 848, was for a principle clearly dealing exclusively with qualified immunity. Therefore, the Court does not agree with Plaintiff that "Defendants misrepresent[ed] the holding of *Barber*." (Doc. No. 65 at 7).

Plaintiffs cite a Ninth Circuit opinion where the court found that "social workers were not entitled to qualified immunity for falsifying documents in February 2000 which lead to the removal of children even though there had been no prior reported opinion directly on point." (*Id.* (citing *Hardwick v. Cnty. of Orange*, 844 F.3d 1112 (9th Cir. 2017)). The Court does not find the Ninth Circuit opinion persuasive in the face of binding, on-point Sixth Circuit precedent.

Therefore, the Court finds that Plaintiffs have failed to show that their constitutional rights were so clearly established that Scott and Duncan would have clearly understood they were under an affirmative duty to refrain from the alleged conduct. *See Edwards*, 170 F. Supp. 2d at 735. Even viewing the facts in the First Amended Complaint in a light most favorable to Plaintiff, the Court finds that Scott and Duncan are entitled to qualified immunity for RBT and CT's Fourth Amendment claim brought pursuant to § 1983.

### Dr. Lowen

Assuming *arguendo* that Dr. Lowen is a state actor, the Court first must ask whether Dr. Lowen, a privately-employed physician, can invoke qualified immunity since she is merely *imputed* to be a state actor. The law on qualified immunity for private actors performing state functions is unsettled. In *Richardson v. McKnight*, 521 U.S. 399, 410-11 (1992), the Supreme Court held that guards working in a privately-run, for-profit, prison could not seek qualified-immunity protection. Twenty years later in *Filarsky v. Delia*, 123 S. Ct. 1657 (2012), the Supreme Court distinguished *Richardson* and offered a broader statement regarding the applicability of qualified immunity to private actors. "The question in [*Filarksy*] is whether an individual hired by the government to do its work is prohibited from seeking such immunity, solely because he works for the government on something other than a permanent or full-time basis." *Id.* at 1660. The Supreme Court answered that question in the negative. *Id.* at 1668. The Supreme Court explained

that *Richardson* was a "self-consciously 'narrow'" holding, one "not meant to foreclose all claims of immunity by private individuals." *Id.* at 1667. The Supreme Court emphasized the particular circumstances of *Richardson*—"'a private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertak[ing] that task for profit and potentially in competition with other firms"— combined sufficiently to mitigate the concerns underlying recognition of governmental immunity under § 1983." *Id.* (quoting *Richardson*, 521 U.S. at 413). The Supreme Court distinguished the facts at hand: "[t]hough not a public employee, Filarsky was retained by the City to assist in conducting an official investigation into potential wrongdoing. There is no dispute that government employees performing such work are entitled to seek the protection of qualified immunity." *Id.*

Here, the Court finds that under these facts, this case is closer to *Filarsky* than *Richardson*. According to the First Amended Complaint, DCS sought out Dr. Lowen specifically to perform a state function (*i.e.*, investigating child abuse) to render an opinion for the purpose of initiating child removal proceedings. These are clearly state functions. And unlike the allegations in *Richardson*, there are no allegations in Plaintiff's First Amended Complaint of anything like the circumstances involved in *Richardson*, *i.e.*, that Dr. Lowen's employer, VUMC, was "systematically organized to assume a major lengthy administrative task [conducting the state's child abuse investigations] with limited direct supervision by the government, undertak[ing] that task for profit and potentially in competition with other [medical centers]." *Id.* at 1667. Thus, under *Filarksy*, the Court believes Dr. Lowen is entitled to assert qualified immunity.

In a similar circumstance, the Tenth Circuit has relied on *Filarsky* in holding that a private physician retained by the state to perform state functions (*i.e.*, an execution) could assert qualified immunity. *Lockett by & through Lockett v. Fallin*, 841 F.3d 1098, 1108-09 (10th Cir. 2016). The

court reasoned that the physician was "entitled to assert qualified immunity because the purposes of qualified immunity support its application here: carrying out criminal penalties is unquestionably a traditional function of government[.]" *Id*. at 1108. Likewise, the First Amended Complaint alleges that Dr. Lowen was "contacted directly by DCS" and knew that her evaluation was "investigative and would be provided to and relied upon by DCS to remove the children." (Doc. No. 52 at ¶¶ 12-14). Such a child abuse investigation is a traditional government function. *See also Frazier v. Bailey*, 957 F.2d 920, 929 (1st Cir. 1992) (holding that private social workers who work for agencies under contract with the state to provide counseling *and investigative services in suspected cases of child abuse* were the functional equivalent of state actors and therefore entitled to assert qualified immunity).

In their responses, Plaintiffs nowhere dispute that Dr. Lowen *could* receive qualified immunity despite being a privately-employed physician, depending on the particular allegations here at issue. Instead, they argue that Dr. Lowen is not entitled to *receive* qualified immunity given the allegations in this case, which (according to Plaintiffs) set forth a clearly established constitutional violation. (Doc. Nos. 65, 66). Given the lack of objection to Dr. Lowen asserting the defense of qualified immunity despite being a privately-employed physician, and the above-referenced case law supporting such assertion, the Court concludes that Dr. Lowen may at least seek to establish qualified immunity based on the allegations in this case

Therefore, the Court will examine whether Dr. Lowen actually is entitled to qualified immunity. Plaintiffs allege that Dr. Lowen: (1) conducted a negligent medical investigation; and (2) either withheld exculpatory evidence of other causes of RBT's injuries from DCS workers, or acted in concert with DCS workers, to keep exculpatory information from the juvenile court, thereby causing the wrongful removal of RBT and eventually CT. (Doc. No. 52 at ¶ 60).

There is simply no clearly established law that a physician reporting suspected child abuse, even if acting in the role of a state investigator, violates the Fourth Amendment by failing to include "possible medical conditions that could mimic child abuse by manifesting with the same or similar injuries to the child" in the information supplied to a state children's services agency. (Doc. No. 52 at ¶ 60). All the cases Plaintiffs invoke here are distinguishable and do not create or reflect a clearly established Fourth Amendment right against Dr. Lowen's alleged conduct. Plaintiffs cite to *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), where hospital staff were held to have violated a patient's Fourth Amendment rights by testing for cocaine through a urine drug screen for pregnant patients with the specific purpose of incriminating those patients under a particular state criminal law. 532 U.S. at 86. Specifically, the Supreme Court held that the urine tests were non-consensual "searches" within the meaning of the Fourth Amendment. *Id*.

Plaintiffs also cite to *Wesley v. Campbell*, 779 F.3d 421 (6th Cir. 2015) for the proposition that a negligent investigation can support a claim for wrongful arrest. In *Wesley*, after hearing a child's allegations of sexual abuse, a police officer did little to no follow-up investigation before arresting the plaintiff. 779 F.3d at 430. The court held that these allegations pleaded "a violation of [the plaintiff's] clearly established Fourth Amendment right against wrongful arrest." *Id*. at 434.

These cases are plainly distinguishable from the instant case because neither case involves *the wrongful seizure of a child for child welfare purposes* (as opposed to a seizure in the nature of an arrest or other detention for criminal investigation or prosecution purposes). Each of the cases instead involves plaintiffs who were *arrested* and *criminally* charged—a context in which Fourth Amendment protections are at their broadest. This distinction alone is enough to extinguish Plaintiff's assertion that these cases create a clearly established constitutional right.

Plaintiffs also cite in their First Amended Complaint to *Thomas v. Nationwide Children's Hospital*, 882 F.3d 608 (6th Cir. 2018), which is somewhat more analogous. In *Thomas*, medical personnel treated three infants, aged between 19 days old and six months, for serious injuries, including skull fractures and a broken leg. 882 F.3d at 610. The physicians suspected child abuse, and they conducted imaging and testing to identify additional injuries, then alerted the Franklin County Children Services of their suspicions. *Id*. The parents filed a § 1983 claim against the hospital, the county, and individual physicians alleging that the medical testing violated their children's Fourth (and Fourteenth) Amendment right to be free from unreasonable searches. *Id*. The court held that the physicians were not liable, because they were not state actors and they "conducted the diagnostic tests to help [the children] medically, not to incriminate their parents personally." *Id*. at 616. Nevertheless, Plaintiffs emphasize that the court in dicta stated, "when [hospital staff] undertake to obtain such evidence from their patients for the specific purpose of incriminating those patients, they have a special obligation to make sure that the patients are fully informed about their constitutional rights[.]" *Id*. (quoting *Ferguson*, 532 U.S. at 70) (internal quotation marks omitted).

The Court finds *Thomas* distinguishable because that case involved claims of *wrongful search* of the children, while the instant Complaint alleges that Dr. Lowen's actions led to a *wrongful seizure*[7] of the children. Here, the First Amended Complaint contains no allegations regarding a lack of consent to examine or "search" RBT—allegations that were the basis of the plaintiffs' Fourth Amendment wrongful search claim in *Thomas*. In fact, Plaintiffs allege that "[t]he parents consented to the full examination of the child [(RBT)] which included several x-

---

[7] As noted earlier, the alleged wrongful seizure of the children here was not the typical Fourth Amendment seizure of an arrest or criminal investigative detention. This serves to further distinguish the instance case from *Thomas, which involved a criminal investigative search.*

rays." (Doc. No. 52 at ¶ 11). Therefore, the Court does not see how *Thomas* could create a clearly established right that placed beyond debate the proposition that Dr. Lowen was constitutionally required to disclose all possible causes of RBT's injuries to DCS workers to prevent his wrongful removal. *See Mullenix*, 36 S. Ct. at 308. Moreover, even if *Thomas* did create a clearly established constitutional right as to such conduct, it was decided by the Sixth Circuit in 2018. Consequently, a reasonable physician in Dr. Lowen's shoes could not have understood from *Thomas* she was "under an affirmative duty to refrain from [such] conduct", when examining RBT in 2014.

Therefore, Plaintiffs fail to allege any violation of clearly established law as to Dr. Lowen. Furthermore, the Court finds that based on the allegations in the First Amended Complaint (*i.e.*, "Dr. Lowen placed herself in an investigatory role . . . . [and] concealed [] exculpatory information from the [juvenile court] in the petition . . . . [Dr.] Lowen is a state actor." (Doc. No. 52 at ¶ 60)), Dr. Lowen's role was akin to Duncan and Scott's role in investigating child abuse as an arm of the state in preparation to initiate removal proceedings. Therefore, given Plaintiffs' theory, Dr. Lowen would be entitled to qualified immunity for the same reasons outlined above that the Court concluded Duncan and Scott are entitled to qualified immunity, because there was not a clearly established Fourth Amendment right against a state employee causing a removal order of a child to be executed, even if the state employee knew that the removal order was based on incomplete information. *See Brent*, 901 F.3d at 685. Accordingly, Dr. Lowen is entitled to qualified immunity, because Plaintiffs do not allege a violation of a clearly established constitutional right.

*ii. The Parent's Fourth Amendment Claims*

As described above, Plaintiffs alleges that "[t]he parents were wrongfully arrested (loss of their liberty interest to parent their children) and maliciously prosecuted due to the negligent investigation of Dr. Lowen and Tonya Scott in the concealment of medical information which

would negate probable cause of child abuse." (Doc. No. 52 at ¶ 58). Dr. Lowen, Scott, and Duncan contend that they are entitled to qualified immunity for these claims because Plaintiffs did not allege facts that state a constitutional violation.[8]

The Court will first take up Mr. and Ms. Turner's malicious prosecution claim. "The Sixth Circuit 'recognize[s] a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment,' which 'encompasses wrongful investigation, prosecution, conviction, and incarceration.'" *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (quoting *Barnes v. Wright*, 449 F.3d 709, 715–16 (6th Cir. 2006)) (internal quotation marks omitted). To state a malicious-prosecution claim under § 1983, a plaintiff must plead facts that show the following: (1) "that a *criminal prosecution* was initiated against the plaintiff and that the defendant 'ma[d]e, influence[d], or participate[d] in the decision to prosecute'"; (2) "that there was a lack of probable cause for the *criminal prosecution*"; (3) "as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty"; and (4) "the *criminal proceeding* must have been resolved in the plaintiff's favor." *Id*. at 308-09 (citations omitted) (emphasis added) (internal quotation marks omitted).

Plaintiffs agree that they do not allege in the First Amended Complaint that Mr. and Ms. Turner were *criminally* prosecuted. Instead, Plaintiff argues that to sustain an action against

---

[8] In response, Plaintiffs argue that they have pled facts that state a malicious prosecution claim under Tennessee law. However, the First Amended Complaint does not assert a state law malicious prosecution claim and references only violations of Plaintiffs' constitutional rights. Thus, the Court will not construe the First Amended Complaint as asserting a state law malicious prosecution claim. *See Richter v. Seterus, Inc.*, No. 15-cv-12874, 2016 WL 8200520, at *3 (E.D. Mich. May 16, 2016) ("[P]arties may not assert new claims in response to a motion to dismiss."); *cf. Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 666 (6th Cir. 2012) ("[A] plaintiff may not expand his claims to assert new theories for the first time in response to a summary judgment motion."). Even if the Court were to construe Plaintiffs' First Amended Complaint as asserting a malicious prosecution state law claim, the Court would decline to exercise jurisdiction over that claim, because the Court is dismissing all federal claims. *See Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 583 (6th Cir. 2007) ("A district court may decline to exercise supplemental jurisdiction over state law claims if it has dismissed all claims over which it had original jurisdiction." (citing 28 U.S.C. § 1367(c)(3)); *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims[.]").

Defendants for malicious prosecution, "the legal proceeding is not required to be a criminal proceeding[.]" (Doc. No. 65 at 19). However, Plaintiffs point to no authority supporting this proposition, and the Court through its own research can find none. In fact, the Court has found authority supporting the precisely opposite proposition. *See Adams v. Coughlan*, No. 2:14-CV-41, 2015 WL 300465, at *2 (S.D. Ohio Jan. 22, 2015) ("[T]he § 1983 malicious prosecution claim fails for the fundamental reason that such a cause of action is confined to the context of criminal proceedings."); *Innovation Ventures, L.L.C. v. Aspen Fitness Prod., Inc.*, No. CV 11-13537, 2012 WL 12930412, at *3 (E.D. Mich. Sept. 30, 2012) (dismissing malicious prosecution claim because "no criminal charges have been filed"); *D'Angelo-Fenton v. Town of Carmel*, 470 F. Supp. 2d 387, 396 (S.D.N.Y. 2007) (dismissing malicious prosecution claim because "no criminal proceedings were commenced"). Accordingly, Plaintiffs have not pled facts that demonstrate malicious prosecution cognizable (under § 1983) as a Fourth Amendment violation. And even if their malicious prosecution theory were so cognizable as of today, such "malicious prosecution" would not have been a clearly established constitutional violation at the time at issue, because it did not involve a criminal prosecution. Thus, Dr. Lowen, Duncan, and Scott are entitled to qualified immunity for Mr. and Ms. Turner's Fourth Amendment claim.

As to Mr. and Ms. Turner's wrongful arrest claim, it likewise does not allege a constitutional violation. A claim for wrongful arrest requires one to be actually arrested (*i.e.*, "there must be either the application of physical force, however slight, or, where that is absent, submission to an officer's 'show of authority' to restrain the subject's liberty."). *Gardenhire v. Schubert*, 205 F.3d 303, 313 (6th Cir. 2000) (citing *California v. Hodari D.*, 499 U.S. 621, 626-28 (1991)); *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009) ("A person who has been the victim of *an unlawful arrest or wrongful seizure* under the color of law has a claim based on the Fourth

Amendment guarantee that government officials may not subject citizens to searches and seizures without proper authorization.") (emphasis added).

In an apparent attempt to satisfy this requirement, Plaintiffs allege in the Complaint that the "arrest" was the restraint of Mr. and Ms. Turner's liberty (*i.e.*, their right to familial association). However, even Plaintiffs concede that "there is no case on point to demonstrate the analogy to the seizure of children as a restraint of 'the subject's liberty[.]'" (Doc. No. 65 at 20). Thus, Plaintiffs have pointed the Court to no authority supporting the proposition that a claim for unlawful arrest of the plaintiff can be brought when there was *no actual arrest or physical seizure* of the plaintiff, and the Court through its own independent research can find none. Accordingly, Plaintiffs have not pled facts that demonstrate a violation of a constitutional right, let alone one that was clearly established at the relevant juncture.

Moreover, the statute of limitations begins to run when a plaintiff knows or has reason to know of the injury which is the basis of his or her action. *Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 839 F.3d 458, 461 (6th Cir. 2016). Thus, Mr. and Ms. Turner's claim for wrongful arrest "accrue[d] at the time of the arrest." *Haag v. Vill. Of Camden*, 23 F. App'x 384, 385 (6th Cir. 2001) (citing *McCune v. City of Grand Rapids*, 842 F.2d 903, 906 (6th Cir. 1988)). "The statute of limitations applicable to a § 1983 action is the state statute of limitations applicable to personal injury actions under the law of the state in which the § 1983 claim arises." *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007) (citing *Kuhnle Bros., Inc. v. Cnty. of Geauga*, 103 F.3d 516, 519 (6th Cir. 1997)). Tennessee law provides a one-year limitation period for personal injury actions. *See* Tenn. Code Ann. § 28–3–104(a)(3). Any deprivation of Mr. and Ms. Turner's liberty interest, to the extent this could be considered an

"arrest", occurred far prior to August 4, 2017, one year prior to the filing of this lawsuit. (*See* Doc. No. 1). Accordingly, Mr. and Ms. Turner's wrongful arrest claim is time-barred.

### iii. The Minors and Parents' Fourteenth Amendment Claim

The nature of Plaintiffs' due process claim is not entirely clear, but it appears to be based on assertions that Dr. Lowen, Duncan, and Scott withheld exculpatory evidence of other possible medical causes of Plaintiff's injuries. In their response to Scott and Duncan's Motion to Dismiss, Plaintiffs attempt to clarify the basis of their due process claim by asserting that they "bring a cause of action for Fourteenth Amendment violations for interference with their privacy interest of familial integrity without due process, *i.e.* with *ex parte* orders in which the [Defendants] concealed the exculpatory evidence that would negate probable cause." (Doc. No. 65 at 12).

Plaintiffs allege that prior to RBT's seizure, Dr. Lowen acted either independently, or in concert with DCS employees, to "intentionally [withhold] information related to possible medical conditions that could mimic child abuse by manifesting with the same or similar injuries to the child." (Doc. No. 52 at ¶ 60). Further, Plaintiffs allege that Duncan did not provide "exculpatory evidence" to the juvenile court when substantiating abuse and that Scott did not provide "exculpatory evidence" to the juvenile court when initiating proceedings to remove CT from Mr. and Ms. Turner's custody. (*Id*. at ¶¶ 62-63). Plaintiffs argue that "the concealment of exculpatory evidence is clearly established as a constitutional violation[.]" (Doc. No. 66 at 17).

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court stated that the failure to disclose material information is a due process violation "irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 86. In *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006), the Sixth Circuit interpreted *Brady* in the context of a § 1983 claim and held that a police officer and an examiner with the state police crime laboratory can be held liable under the Fourteenth

Amendment due process clause for knowingly withholding exculpatory evidence. 444 F.3d at 743-44. While this is a well-established rule in the criminal context, Plaintiffs cite no authority in which such a requirement has been applied in child-removal proceedings.

To the contrary, existing authority declines to extend *Brady* to civil cases. *See Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 662 (S.D. Ohio 2016) ("The Court is aware of no controlling 'case law extending the [*Brady*] rule to civil matters[.]"); *Clearly v. Cnty. of Macomb*, No. 6-15505, 2007 WL 2669102, at *17 (E.D. Mich. Sept. 6, 2007), *aff'd*, 409 F. App'x 890 (6th Cir. 2011) ("[T]his Court does not believe that Wolf, a social worker who was not retained by the police of prosecution (and thus not a 'police investigator'), can be held liable for a *Brady* violation." (citing *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)); *Lavallee v. Coplan*, 374 F.3d 41, 44–45 (1st Cir. 2004) (noting that child-services agency in New Hampshire was "neither the police nor the equivalent of the police in assisting the prosecution").[9] Plaintiffs again cite to *Wesley* for the proposition that the right to receive "exculpatory" evidence is a clearly established right; however, as noted above, this case deals with a police officer's investigation in a criminal case. 779 F.3d at 421. That is simply not analogous to the facts alleged here.[10]

---

[9] In *Demjanjuk v. Petrovsky*, 10 F.3d 338, 353 (6th Cir. 1993), the Sixth Circuit extended *Brady* to cover denaturalization and extradition cases where the government seeks denaturalization or extradition based on proof of alleged criminal activities of the party again which the government is proceeding. However, in a subsequent opinion, the Sixth Circuit cautioned that the holding of *Demjanjuk* "must be read in the context of a case that involved an unusual set of circumstances" based on the United States' own investigation of the underlying *criminal* offense. *In re Extradition of Drayer*, 190 F.3d 410, 413 (6th Cir. 1999)*; see also U.S. ex rel. (Redacted) v. (Redacted)*, 209 F.R.D. 475, 482 (D. Utah 2001) ("[T]he Sixth Circuit, the only circuit court to support civil extension of *Brady*, backed away from its previous decision in *Demjanjuk* in the more recent In the Matter of the Extradition of Michael John Drayer case."). Accordingly, *Demjanjuk* would not apprise Dr. Lowen, Duncan, and Scott that their alleged conduct violated a clearly established constitutional right.

[10] Even if the Court were to construe *Brady* to apply here, Plaintiffs nevertheless have failed to allege a *Brady* violation, because Plaintiffs alleged that Dr. Lowen, Scott, and Duncan withheld exculpatory information *from the juvenile court*. (Doc. No. 52 at ¶¶ 29, 55). "A *Brady* violation does not occur because the allegedly exculpatory [] evidence was not brought to the attention of the *court*." *Clarke v. Upton*, No. CV-F-07-888 OWW/SMS, 2009 WL 1460815, at *19 (E.D. Cal. May 26, 2009) (citing *Devereaux v. Abbey*, 263 F.3d 1070, 1079 (9th Cir. 2001)). Rather, *Brady* requires prosecutors to disclose materially exculpatory evidence in the government's possession *to the defense*. 373 U.S. at 87.

Therefore, even viewing the factual allegations in the light most favorable to Plaintiffs, Dr. Lowen, Scott, and Duncan are entitled to qualified immunity because the duty to turn over "exculpatory evidence" in a civil child removal proceeding does not exist and, alternatively, was not clearly established at the time of the alleged events.[11]

## IV. VUMC is Entitled to Dismissal

Assuming VUMC is a state actor, Plaintiffs have failed to state a claim against it, given the so-called *Monell* requirements for pleading a Section 1983 claim against an entity, including a private entity such as VUMC.

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978), addressed the liability of a particular kind of entity—a municipality—under Section 1983, setting forth particular requisites for such liability. Any liability of a municipality "under Section 1983 must be premised upon a showing of municipal liability under the analysis set out in *Monell*." *Ezell v. Metro. Gov't of Nashville & Davidson Cnty.*, No. 3:11-0405, 2012 WL 2601940, at *5 (M.D. Tenn. June 6, 2012). Municipalities "may not be sued under § 1983 for an injury inflicted solely by its employees or

---

[11] Additionally, and alternatively, Mr. and Ms. Turner's due process claim is time-barred. "The statute of limitations applicable to a § 1983 action is the state statute of limitations applicable to personal injury actions under the law of the state in which the § 1983 claim arises." *Eidson*, 510 F.3d at 634 (citing *Kuhnle Bros.*, 103 F.3d at 519. Tennessee law provides a one-year limitation period for personal injury actions. *See* Tenn. Code Ann. § 28–3–104(a)(3).

"The date on which the statute of limitations begins to run in a § 1983 action is a question of federal law." *Id.* (citing *Kuhnle Bros.*, 103 F.3d at 520). Under federal law, the statute of limitations for a § 1983 action begins to run "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.* (citing *Kuhnle Bros.*, 103 F.3d at 520). Thus, when determining when a statute of limitations begins to run, the Sixth Circuit has "'looked to what event should have alerted the typical lay person to protect his or her rights.'" *Id.* (quoting *Kuhnle Bros.*, 103 F.3d at 520). When a cause of action involves the wrongful removal of child, the Sixth Circuit has stated that "[t]he precipitating event . . . [is a] defendants' initial removal of [the child] from [the parent's] custody . . . [because] [a]t the time of the initial removal, plaintiff knew of the injury which is the basis of [the] claim." *Id.* (affirming dismissal of the plaintiff's fourteenth amendment claim because the claim was barred by the statute of limitations). *See also Jackson v. Nix*, 477 F. Supp. 2d 918, 921 (M.D. Tenn. 2007).

Here, Plaintiffs allege that RBT was initially removed from Mr. and Ms. Turner's custody on December 13, 2014, and CT was initially removed from their custody on September 8, 2015. Plaintiffs filed suit in this Court on August 3, 2018, almost three years after Mr. and Ms. Turner's youngest son was removed from their custody. (*See* Doc. No. 1). Accordingly, Mr. and Ms. Turner's claim based on the alleged violation of their right to familial association claim is time-barred.

agents" on a theory of *respondeat superior* liability. "[M]unicipalities can be held liable for harms caused by[:]" (1) "direct actions of the municipalities themselves[;]" (2) "harms caused by the implementation of municipal policies or customs[;]" (3) "and harms caused by employees for whom the municipality has failed to provide adequate training [or supervision]." *Morgan v. Fairfield Cnty. Ohio*, 903 F.3d 553, 565 (6th Cir. 2018) (internal citations omitted).

It is well-established by now that the principles of *Monell* apply also to private entities alleged to be state actors for purposes of Section 1983:

> While "a private entity that contracts to perform traditional state functions may . . . be sued pursuant to § 1983," a § 1983 claim cannot be based solely on a theory of *respondeat superior*. *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Rather, an entity may be liable under § 1983 only if its official policies or customs resulted in injury to the plaintiff. *Id.*

*O'Brien v. Michigan Dep't of Corr.*, 592 F. App'x 338, 341 (6th Cir. 2014).

"A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom or tolerance or acquiescence of federal rights violations." *Anciani v. Davidson Cnty. Sheriff Office*, No. 3:19-CV-00169, 2019 WL 1002503, at *2 (M.D. Tenn. Feb. 28, 2019) (citing *Burgess v. Fisher*, 735 F.3d 462, 478 (6th Cir. 2013)).

Evidently seeking to plead a *Monell*-compliant theory, Plaintiffs allege that "[t]he practices and policies of [VUMC] are the moving force behind the role taken by Lowen to act as investigator [sic] and impugn parents for child abuse without disclosing other mimics of child abuse before the [juvenile court] makes a probable cause determination." (Doc. No. 52 at ¶ 61). This is merely a conclusory allegation regarding policies in general that is insufficient to survive the instant motion

to dismiss. "A broad assertion that an unconstitutional policy exists 'is nothing more than a bare recitation of legal standards.'" *Osberry v. Slusher*, 750 F. App'x 385, 398 (6th Cir. 2018) (quoting *Brown v. Cuyahoga Cnty.*, 517 F. App'x 431, 436 (6th Cir. 2013); *see also Triemert v. Washington Cnty.*, Civ. No. 13–1312, 2013 WL 6729260, at *12 (D. Minn. Dec. 19, 2013) (Schiltz, J., adopting Report & Recommendation of Graham, M.J.) (plaintiff's "vague and conclusory allegations that his injuries were caused by some unidentified unconstitutional policies, customs or practices is not sufficient to state a *Monell* claim"), *aff'd*, 571 F. App'x. 509 (8th Cir. 2014).

The insufficiency of the allegations in the First Amended Complaint to state a claim for municipal liability against VUMC under Section 1983 is still more apparent from what is missing. The First Amended Complaint does not identify or describe any of VUMC's policies, procedures, practices, or customs relating to training; it does not identify any particular shortcomings in that training or how those shortcomings caused the alleged violations of Plaintiffs' rights; and it does not identify any other previous instances of similar violations that would have put VUMC County on notice of a problem. Such a complaint is insufficient. *See Okolo v. Metro. Gov't of Nashville*, 892 F. Supp. 2d 931, 944 (M.D. Tenn. 2012); *Hutchison v. Metro. Gov't of Nashville*, 685 F. Supp. 2d 747, 751 (M.D. Tenn. 2010).

Merely proffering a theory of legal liability that is unsupported by allegations setting forth factual matter does not suffice to state a claim for relief which survives a motion to dismiss. *See Iqbal*, 556 U.S. at 678–79. As has been noted, "[i]n the context of Section 1983 municipal liability, district courts in the Sixth Circuit have interpreted *Iqbal*'s standards strictly." *Hutchison*, 685 F. Supp. 2d at 751 (collecting cases). For the reasons set forth above, Plaintiffs have not satisfied those standards with respect to a Section 1983 claim against VUMC. Accordingly, Plaintiffs have failed to state a claim against VUMC, which accordingly will be dismissed.

**CONCLUSION**

The events alleged by Plaintiffs are heart-rending. Other courts have recognized that cases such as these are "difficult case[s], pitting the fundamental rights of parents and families . . . against the awesome responsibilities of a [governmental agency] to investigate child abuse, a most reprehensible and ever-increasing problem." *See J.B. v. Washington Cnty.*, 127 F.3d 919, 932 (10th Cir. 1997). Plaintiffs' alleged wrongful, forced separation from their newborn children for two years is a circumstance that naturally would evoke sympathy. But the Court must decide the motions to dismiss based not on sympathy, but on the law as applied to the allegations of the First Amended Complaint.

For the foregoing reasons, the Court finds that Duncan and Scott are absolutely immune from suit. Furthermore, the Court finds that Duncan, Scott, and Dr. Lowen are entitled to qualified immunity. Consequently, Dr. Lowen and VUMC's Motion to Dismiss (Doc. No. 58), and Scott and Duncan's Motion to Dismiss (Doc. No. 53), will be **GRANTED**.

An appropriate order will be entered.

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE